IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DREAMA L. CHAPMAN,                )
                                  )          Civil Action No. 05-1707
                  Plaintiff,      )
                                  )
     vs.                          )
                                  )
UPMC HEALTH SYSTEM,               )
                                  )
                  Defendant,      )

## MEMORANDUM OPINION

CONTI, District Judge

     In this memorandum opinion, the court considers the motion for summary judgment (Doc. No. 18) filed by defendant UPMC Health System ("defendant" or "UPMC") with respect to all claims against UPMC asserted by plaintiff Dreama L. Chapman ("plaintiff" or "Chapman").  Plaintiff in her complaint asserted claims against UPMC for interference and retaliation under the Family and Medical Leave Act of 1993, as amended, 29 U.S.C. §2601 *et seq.* ("FMLA") and for failure to accommodate and for failure to engage in good faith in the interactive process under the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 *et seq.* ("Rehab Act").  After considering the joint statement of material facts and the other submissions of the parties, and drawing all reasonable inferences in favor of plaintiff, the nonmoving party, the court will grant summary judgment in favor of defendant with respect to plaintiff's interference claim under the FMLA and plaintiff's Rehab Act claims.  With respect to plaintiff's retaliation claim under the FMLA, defendant's motion for summary judgment will be denied.

*Factual Background*

**Plaintiff's employment with UPMC**

Plaintiff began her employment with UPMC in December 2002 at UPMC's Braddock Hospital Rehabilitation Psychiatric Emergency Room ("Braddock Hospital").  When plaintiff began her employment with UPMC, she received a copy of UPMC's employee handbook containing its policies and procedures.  (Deposition of Dreama Chapman ("Chapman Dep.") at 21-22; Chapman Dep. Ex. 8.)  The employee handbook provides, in part, that UPMC has a FMLA policy for its employees.  (Chapman Dep. Ex.34.)  In order to apply for FMLA leave, an employee must have certain paperwork completed by the employee, the employee's manager or supervisor, the employee's physician and the HR department.  (Chapman Dep. Ex. 34.) Intermittent FMLA leave allows an employee to be excused from work for one to two weeks per month as needed by the employee.  (Deposition of Shannon Dembowski ("Dembowski Dep.") at 12-13.)  The maximum number of weeks that any employee may be excused from work pursuant to an FMLA leave is twelve weeks per year.  (Chapman Dep. Ex. 34; Dembowski Dep. at 13.) Once intermittent leave has been approved for an employee, the employee must do two things to take intermittent FMLA leave.  (Dembowski Dep. 12-13.)  First, the employee must notify her manager that she needs to call off sick.  (Id. at 13.)  Next, the employee must notify her manager that the day should be recorded FMLA leave.  (Id. at 13.)

UPMC's employee handbook also provides that UPMC intends to provide a workplace free of illicit drugs.  (Chapman Dep. at 27; Chapman Dep. Ex. 10.)  The employee handbook further provides that any employee who tests positive for illicit drug use will be confronted by superiors, tested for the presence of drugs or alcohol, and sent to treatment.  (Chapman Dep. at

2

29.)  In some instances, UPMC will enter into Last Chance Agreements with employees.  Last Chance Agreements require that the subject employee submit to random drug and alcohol testing and treatment for a minimum of three years.  (Chapman Dep. Ex. 12.)  UPMC enters into Last Chance Agreements in order to preserve the employee's status with UPMC while encouraging the employee to receive treatment for drug and alcohol abuse.  (Id.)

In January 2004, plaintiff requested and received a transfer from Braddock Hospital to UPMC Living Sober Rehabilitation ("Living Sober").  (Defendant's Joint Statement of Material Facts ("J.S.") Doc. No. 38 at 2, ¶ 3, Chapman Dep. at 10-12, 14.)  Living Sober is a residential drug and alcohol treatment program.  (Chapman Dep. at 49.)  Plaintiff's first day of employment with Living Sober was June 13, 2004 and she served as an outpatient nurse clinician.  While employed at Living Sober, plaintiff's supervisors were Curt Bell ("Bell"), RN clinical supervisor, Pam Bucci ("Bucci"), clinical supervisor, and Catherine Coleman ("Coleman"), director.  (Id. at 12-13.)

Plaintiff repeatedly complained about her work schedule to her supervisors.  (Id. at 62-63.)  Plaintiff believed that the scheduling was starting to have negative physical effects on her.  (Id. at 15-16, 62-63.)  For example, plaintiff often had difficulty catching her breath during her employment at Living Sober.  (Id. at 49.)  Plaintiff also had difficulty talking on the phone because she would occasionally lose her voice as a result of a prior bout with throat cancer.  (Id. at 49.)  Plaintiff, however, was able to perform each of her job functions while employed at Living Sober.  (Id. at  51.)

**Plaintiff's Medical Conditions**

Plaintiff suffers from a number of medical conditions including: throat cancer (recovery), a weakened immune system, chronic obstructive pulmonary disease, asthma, chronic back pain, bulging disc, hypothyroid, hepatitis C, possibly sarcoidosis, cirrhosis of the liver, arthritis, depression and bipolar disorder.  (J.S. at 1, ¶ 1; id. at 24, ¶ 37; Chapman Dep. at 44-45, 53, 55.) As a result of her chronic back pain and bulging disc, plaintiff cannot lift more than 15-20 pounds, has difficulty bending and cannot stoop.  (Chapman Dep. at 54.)  Plaintiff's medical conditions impair her ability to walk, sleep, recreate, work, stand, cook and do laundry.  (Id. at 59.)  Plaintiff has joint pain when she stands or walks.  (Id. at 59-60.)  As a result, plaintiff has difficulty walking both long and short distances on a daily basis.  (Id. at 60.)  Plaintiff has difficulty sitting for long periods of time.  (Id. at 61.)  Plaintiff, however, does not have any difficulty thinking or concentrating, but suffers more from the physical side effects of her medical conditions.  (Id. at 61.)

While employed at Living Sober, plaintiff informed supervisors that she needed a schedule change as a result of her physical ailments.  (Id. at 62-63, 66.)  In the summer of 2004, plaintiff informed Bell that she suffered from a number of medical conditions but did not detail the medical conditions for Bell.  (Id. at 67-68.)  She further informed Bell that she could not continue working the schedule that she was currently working because of her physical ailments. (Id. at 67.)  Bell advised plaintiff that she had to work out the scheduling problems with the other nurses.  (Id.)  Plaintiff repeatedly requested schedule changes.  (Id. at 62.)  Plaintiff requested schedule changes from Bell four to five times during 2004 and also informed Coleman that she was unhappy with her schedule.  (Id. at 64, 69-70.)  Plaintiff did not inform Coleman that she

4

needed a different schedule because of her medical conditions, but instead referred to a general dissatisfaction with the scheduling.  (Id. at 69-70.)  Plaintiff did advise Coleman that she was physically feeling worse.  (Id. at 71.)

In the fall of 2004, Bell informed plaintiff that another nurse was being hired and the new nurse would relieve some of the scheduling problems from which plaintiff was currently suffering.  (Id. at 67.)  When the new nurse was hired, the scheduling problems as they related to plaintiff were not corrected.  (Id. at 70, 72.)

Plaintiff was hospitalized on February 7-8, 2005.[1]  (Id. at 73.)  After plaintiff's hospitalization, plaintiff began calling off work more frequently due to various illnesses.  (Id. at 73-74.)  Plaintiff notified Coleman that she was afraid that she would lose her job as a result of her continued absences.  (Id.)  Coleman advised plaintiff to apply for FMLA leave.  In response to Coleman's advice, plaintiff contacted Dembowski in the HR department, to obtain the paperwork related to FMLA leave.  (Id. at 73-74.)

On April 4, 2005, plaintiff requested FMLA leave.  (Id. at 62-63; Chapman Dep. Ex. 19.) In plaintiff's application for FMLA leave, plaintiff's physician, Dr. Philip J. Cichon ("Cichon"), indicated that plaintiff had a

> Chronic Condition Requiring Treatment
> A **chronic condition** which:
> (1) Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;
> (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and
> (3) May cause episodic rather than a continuing period of incapacity, (e.g., asthma, diabetes, epilepsy, etc.).

---

[1]The reason for plaintiff's hospitalization is not clear from the record.

(Chapman Dep. Ex. 20 (footnote omitted).)  Cichon indicated that plaintiff suffered from medical conditions including cirrhosis, hepatitis C and laryngeal cancer.  (Id.)  Cichon further advised UPMC that plaintiff needed to work intermittently for one to two week intervals.  (Id.)  The application specifically requested information about whether plaintiff was able to perform any work or all of the essential functions of her position.  (Id.)  Cichon informed UPMC that plaintiff was able to work and perform all the essential functions of her job.  (Id.) (answer to question number 7(b).)

Dembowski informed plaintiff that plaintiff was eligible for FMLA leave.  (Chapman Dep. at 108; Dembowski Dep. at 12.)  By email dated April 15, 2005, plaintiff informed Dembowski that "when I came in HR I was so sure that my problem had worsened that week and I was very anxious. . . fortunately it cleared up in 3-4 days. . . ."  (Chapman Dep. Ex.B.)  In an April 26, 2005 email exchange with Dembowski, plaintiff indicated that she would "go long periods [of time] without being ill."  (Chapman Dep. Ex D.)  Plaintiff also informed Dembowski that she had been admitted to the hospital in February 2005, but had not been in the hospital since 2002.  (Id.)  After plaintiff submitted her completed FMLA leave paperwork, UPMC approved plaintiff for twelve weeks of intermittent family medical leave.  (Chapman Dep. at 73, 76; Chapman Dep. Ex.E)

In May 2005, plaintiff requested a transfer from Living Sober to UPMC WPIC, Western Psych Institute ("Western Psych") because she believed her work schedule was overwhelming. (Id. at 11,15-16.)  Plaintiff's last day of employment at Living Sober was June 9, 2005.  (Id. at 11, 14.)  On June 13, 2005, plaintiff began her employment at Western Psych.  (Id. at 9.)

At Western Psych, plaintiff was a dual diagnosis nurse clinician.  (Id.)  As a dual diagnosis nurse clinician, plaintiff was responsible for doing admissions, discharges, medication administration, psychiatric assessments, monitoring and constant observation of patients.  (Id. at 10.)  Trish Thornton ("Thornton"), clinical supervisor, was plaintiff's supervisor.  (Id. at 9.)  When plaintiff transferred to Western Psyche, she did not inform Thornton that she had been previously approved for FMLA leave.  Plaintiff did not tell Thornton about her FMLA leave until her last day of employment,  June 20, 2005.  (Id. at 9, 27, 79-80.)

**Plaintiff's Recollection about the Events of June 20-21, 2005**

On Monday, June 20, 2005, plaintiff was working in her position as a dual diagnosis nurse clinician at Western Psyche.  (Id. at 91.)  Plaintiff was suffering from increased swelling throughout her torso.  (Id.)  Throughout the evening of June 20, 2005, plaintiff was increasingly ill.  Because plaintiff could not compose herself for work, at 5:00 a.m on June 21, 2005, plaintiff contacted the dual diagnosis unit and informed the night nurse, Lois Blanyer ("Blanyer"), that plaintiff would not report to work.  Plaintiff told Blanyer that she was vomiting, short of breath and was still suffering from swelling.  Plaintiff asked Blanyer to deliver this message to the appropriate parties.  Plaintiff did not tell Blanyer that she was taking FMLA leave.  (Id. at 93.)

At approximately 8:30 a.m. or 9:00 a.m., plaintiff contacted Dembowski and advised her that she was calling off for the week.  Plaintiff informed Dembowski that she had a doctor's appointment the following Monday, June 27, 2005, and that she would either see the doctor at the scheduled appointment or that she would be in the hospital.  Plaintiff informed Dembowski that she wanted to take the week off as intermittent FMLA leave.  (Id. at 94.)  Plaintiff did not

know if Dembowski was aware that plaintiff had recently transferred from Living Sober to Western Psyche.  (Id. at 94-95.)

At 5:30 p.m., on the evening of June 21, 2005, Thornton called plaintiff.  Thornton asked plaintiff when she planned on returning to work.  (Id. at 96.)  Plaintiff informed Thornton that plaintiff had a doctor's appointment on the following Monday, June 27, 2005, and that she could not return to work until after she saw her doctor.  Plaintiff also informed Thornton that she had previously called HR to request intermittent family medical leave.  (Id. at 96.)  Plaintiff had not previously informed Thornton that she was approved for FMLA leave.  (Id. at 79-80.)  Thornton informed plaintiff that she needed a resignation from plaintiff.  (Id. at 96.)  Plaintiff became increasingly upset and stated that she could not quit her job because she was having a number of problems.  (Id. at 96.)  The telephone conversation between Thornton and plaintiff escalated with Thornton asking plaintiff for her resignation and plaintiff becoming "hysterical."  (Id. at 96-98.)  The phone conversation ended abruptly when plaintiff hung up the phone.  (Id. at 98.)

Leslie Owens, one of plaintiff's friends, was with plaintiff when plaintiff received the telephone call from Thornton at or around 5:00 pm.  (Id. at 43-44, 98.)  Plaintiff's brother was also with plaintiff when she received the telephone call from Thornton and witnessed plaintiff's end of the conversation.  (Id. at 99.)

The following day, June 22, 2005, plaintiff contacted UPMC's employee assistance program regarding her telephone conversation with Thornton.  Plaintiff spoke to Flo Van Cara ("Van Cara") during her call with the employee assistance program and asked Van Cara to contact the HR department regarding her telephone conversation with Thornton.  On Friday, June 24, 2005, plaintiff contacted Judith Kurzdorfer ("Kurzdofer"), the coordinator of nursing

recruitment, to request information about whether her PTO or FMLA leave had been applied to her paycheck. (Id. at 99-100.) Kurzdorfer advised plaintiff that plaintiff had previously resigned to Thornton earlier that week. (Id.) Plaintiff's last day of employment with UPMC was June 20, 2005. (Id. at 9, 27.) On June 27, 2005, Cichon released plaintiff to return to work. (Id. at 102.)

**Thornton's Recollection about the June 21, 2005 Events**

Thornton recalls that plaintiff did not request that she be permitted to work part-time during either of her two telephone conversations with plaintiff on June 21, 2005. (Declaration of Patricia Thornton ¶ 5.) Thornton also indicated that the individual that replaced plaintiff works full-time. (Id. ¶ 6.) Finally, Thornton indicated that plaintiff did not ask for FMLA leave during her June 21, 2005 telephone conversations with plaintiff and Thornton had no knowledge regarding plaintiff's pre-approved FMLA leave. (Id. ¶ 8.)

**Kurzdorfer's Recollection about the June 21, 2005 Events**

Kurzdorfer recalls that she spoke with Thornton sometime between 1:00 p.m. and 3:00 p.m. on June 21, 2005 regarding plaintiff's alleged resignation. (Deposition of Judith Kurzdorfer ("Kurzdorfer Dep.") at 7.) After Kurzdorfer received this information from Thornton, Kurzdorfer stated that she contacted plaintiff on the afternoon of June 21, 2005. (Id. at 8.) Telephone records, however, are devoid of any indication that Kurzdorfer made this telephone call to plaintiff. (Pl.'s Exs. 9, 10.) Kurzdorfer indicated that she informed plaintiff that she was accepting her verbal resignation. (Kurzdorfer Dep. at 9.) Plaintiff did not confirm that she was resigning from her employment during this conversation. (Id. at 24.) Shortly after Kurzdorfer made this alleged telephone call to plaintiff, plaintiff contacted Kurzdorfer and informed Kurzdorfer that she had not resigned from her employment. (Id. at 10.) Plaintiff further

9

informed Kurzdorfer that she did not know what she was saying when she resigned and that she was physically ill.  (Id. at 12.)  After plaintiff called Kurzdorfer, Kurzdorfer informed Kelly Reale, supervisor, and Leigh Sevick ("Sevick"), that plaintiff had resigned.  (Id. at 10-11.)  Some time later, Kurzdorfer spoke to Thornton to confirm that plaintiff's resignation was complete. (Id. at 32.)

At the time Kurzdorfer spoke to plaintiff, Kurzdorfer was not aware that plaintiff had previously been approved for FMLA leave.  (Id. at 13.)  Kurzdorfer recalls that after she spoke with plaintiff the second time, Dembowski informed Kurzdorfer that plaintiff had requested FMLA leave.  (Id. at 17.)  Kurzdorfer then informed Dembowski that plaintiff had resigned.  (Id. at 17.)  Kurzdorfer did not believe that Dembowski knew anything about plaintiff's resignation prior to this exchange.  (Id.)

## Dembowski's Recollection about the June 21, 2005 Events

Dembowski does not remember speaking to plaintiff until sometime after 1:00 p.m. on June 21, 2005.  (Dembowski Dep. at 36-37.)  Dembowski recalls plaintiff contacting her and asking about her FMLA leave.  Dembowski recalls that Kurzdorfer informed Dembowski that plaintiff had resigned sometime before 1:00 p.m on the day in question.  (Id. at 30-31.)  Upon receiving notification that plaintiff had resigned, Dembowski recorded a notation on a "LOA Information Collection Form."  (Dembowski Dep. Ex. 2.)  The notation indicated that plaintiff's resignation was communicated to Dembowski on June 21, 2005 at 1:00 p.m.  (Id.)  Dembowski's notation on the document was made at the time she received the information from Kurzdorfer. (Dembowski Dep. at 38.)  Dembowski was not sure whether plaintiff communicated her resignation to either Kurzdorfer or Thornton.  (Id. at 30-31.)  Dembowski, therefore, informed

plaintiff that she understood that plaintiff had previously resigned from her position.  (Id. at 13-14.)

**Drug Diversion**

During plaintiff's employment at Living Sober, plaintiff became aware that there was drug diversion occurring in the unit.  (Chapman Dep. at 80.)  Drug diversion occurs when employees are unable to locate or account for patient medications.  (Id.)  Plaintiff first became aware of the drug diversion issue when she was working night shifts at Living Sober.  (Id.)  During her shifts, plaintiff was responsible for counting and reordering medications.  (Id.)  On numerous occasions, medications were missing and plaintiff could not locate the drugs.  (Id.)  When plaintiff suspected drug diversion, she reported it to her supervisor, Bell.  (Id. at 81.)  Bucci later reported the drug diversion to HR because no investigation occurred after plaintiff reported the issue to Bell.  (Id.)  Specifically, Bucci reported the matter to Sevick. (Id.)

In response to Bucci's report, Sevick began an investigation.  (Id. at 81.)  During her investigation, Sevick interviewed and questioned all the nurses who worked in the effected unit. (Id. at 81-82.)  The nurses were asked to provide a urine specimen in accordance with the investigation.  (Id. at 85.)  On June 9, 2005, Sevick interviewed plaintiff and plaintiff provided Sevick with a written statement regarding the drug diversion.  (Id. at 82.)  Plaintiff provided a urine specimen on the same day.  (Id. at 87.)

On June 20, 2005, Dr. Jay Harper, Medical Director for Employee Health Services ("Harper"), contacted plaintiff and informed her that her urine specimen tested positive for oxycodone.  (Id. at 87-88; Deposition of Dr. Jay Harper ("Harper Dep.") at 14, 25.)  Plaintiff provided Harper with a list of the medications that she had previously been prescribed.

11

(Chapman Dep. at 87-88.)  Plaintiff denied ever taking oxycodene.  (Id.)  Harper reviewed the list

of medications provided by plaintiff and determined that those prescription drugs should not have

caused a positive result for oxycodene.  (Harper Dep. at 14.)  On June 21, 2005, Harper notified

Sevick by way of telephone and email that plaintiff tested positive for oxycodene. (Id. at 14-16,

25-26.)  Harper's email was sent at 2:42 p.m. on June 21, 2005.  (Harper Dep. Ex. 1.)

Not every employee who tests positive for drug usage is terminated from employment

with UPMC.  (J.S. at 26, ¶ 71; Kurzdorfer Dep. at 22-23; Harper Dep. at 8.)  In some cases, those

employees who have tested positive for drug usage either enter treatment or enter into an

agreement with UPMC regarding treatment for drug usage.   (Kurzdorfer Dep. at 22-23; Harper

Dep. at 9-10.)

**Plaintiff's Social Security Disability Insurance Claim**

Plaintiff applied for social security disability insurance ("SSDI") benefits after her

employment with UPMC.  (Chapman Dep. at 36-37, 108.)  According to plaintiff's application

for SSDI benefits, plaintiff "became unable to work because of [a] disabling condition on June

20, 2005." (Def.'s Ex. 5.)  Plaintiff's application indicated that she continued to be disabled as of

the date of the application.  (Id.)

In connection with plaintiff's application for SSDI benefits, on August 9, 2005, Cichon

completed the reverse side of an Employability Assessment Form.  (J.S. at 11-12, ¶ 42; Def. Ex.

B.)  On this form, Cichon explained why he believed plaintiff cannot work.  Cichon indicated

that plaintiff recently suffered a nervous breakdown, suffers from bipolar disorder and

depression.  Cichon further indicated that plaintiff suffered from complications from hepatitis C,

including cirrohsis of the liver and fluid buildup in her abdomen.  Cichon noted plaintiff's COPD

asthma and breathing problems that resulted from a prior cancer surgery.  Finally, Cichon

referenced plaintiff's pain in her joints and her inability to stand for long periods.  For these

reasons, Cichon opined that plaintiff is "PERMANENTLY DISABLED" and is precluded from

any gainful employment.  (Id.)  Cichon had the option to designate plaintiff as temporarily

disabled for twelve months or more.  He also had the option of designating plaintiff as

temporarily disabled for less than twelve months.  (Id.)  According to plaintiff, she is unable to

work full-time because of her disabilities.  (Chapman Dep. at 40, 108.)

After exhausting her administrative remedies, plaintiff filed the instant action asserting

claims under the FMLA and the Rehab Act.

### *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if,

drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." FED. R. CIV. P. 56(c).  A motion for summary judgment will not be defeated by

the mere existence of some disputed facts, but will be defeated when there is a genuine issue of

material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  In determining

whether the dispute is genuine, the court's function is not to weigh the evidence or to determine

the truth of the matter, but only to determine whether the evidence of record is such that a

reasonable jury could return a verdict for the nonmoving party.  Id. at 249.  The court is to draw

all reasonable inferences in favor of the nonmoving party. El v. Southeastern Pa. Transp. Auth.,

479 F.3d 232, 238 (3d Cir.2007)("In considering the evidence, the court should draw all reasonable inferences against the moving party.").  The United States Court of Appeals for the Third Circuit recently stated:

> [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

Id.

### *Analysis*

Plaintiff asserts claims for interference and retaliation under the FMLA.  Plaintiff also alleges that defendant failed to accommodate her disability and failed to engage in good faith in the interactive process under the Rehab Act.  Defendant argues that based upon the undisputed evidence of record, plaintiff cannot recover on any of her claims.  The court will first address the FMLA claims and then the Rehab Act claims.

## I.   **FMLA Claims**

### A.  **General**

The FMLA was enacted by Congress in 1993, in part to address problems arising from "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods."  29 U.S.C. § 2601(b)(1).  The act was designed to provide a balance between "entitl[ing] employees to take reasonable leave for medical reasons" and "accommodat[ing] the legitimate interests of employers."  29 U.S.C. §§ 2601(b)(1-2); see Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005) (citing 29 U.S.C. §

2601(b)(1)) (holding that one of  "[t]he primary purposes of the FMLA [is] to 'balance the

demands of the workplace with the needs of families'. . . .").  The FMLA grants eligible

employees the right to take up to twelve work weeks of leave during a twelve-month period for

any of the following reasons:

> (A) Because of the birth of a son or daughter of the employee and in order to care
> for such son or daughter.
> (B) Because of the placement of a son or daughter with the employee for adoption
> or foster care.
> (C) In order to care for the spouse, or a son, daughter, or parent, of the employee,
> if such spouse, son, daughter, or parent has a serious health condition.
> (D) Because of a serious health condition that makes the employee unable to
> perform the functions of the position of such employee.

29 U.S.C. § 2612(a)(1)(A-D).  At the end of the leave period, the employee has the right to be

restored to her former position or an equivalent position.  29 U.S.C. § 2614(a)(1).

An eligible employee[2] under 29 U.S.C. § 2612(a)(1)(C) or (D) may be entitled to take

FMLA leave intermittently

> on a reduced schedule when medically necessary.  The taking of leave
> intermittently or on a reduced leave schedule . . . shall not result in a reduction in
> the total amount of leave to which the employee is entitled . . . beyond the amount
> of leave actually taken.

29 U.S.C. § 2612(b).  The phrase "intermittent leave" is defined under the implementing

regulations as "leave taken in separate periods of time due to a single illness or injury, rather than

for one continuous period of time, and may include leave of periods from an hour or more to

several weeks." 29 C.F.R. § 825.800.

---

[2]The act defines an "eligible employee" as one who has been employed for at least twelve
months by the employer and for at least 1,250 hours during the previous twelve-month period.
29 U.S.C. § 2611(A).  Both parties agree that plaintiff is an eligible employee under the FMLA.

**B.  Interference claim**

Under the FMLA, "it shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1).  In order for a plaintiff to establish a claim for an interference of FMLA rights, "the employee only needs to show that he was entitled to benefits under the FMLA and that he was denied them." Callison, 430 F.3d at 119.

"Courts have refused to recognize a valid claim for interference in the absence of any injury." Alfiano v. Merck & Co.,175 F.Supp.2d 792, 794 (E.D.Pa. 2001)(citing Voorhees v. Time Warner Cable Nat'l Div., No. 98-1460, 1999 U.S. Dist. LEXIS 13227 (E.D. Pa. 1999); Fry v. First Fidelity Bancorp., No. 95-6019, 1996 U.S. Dist. LEXIS 875 (E.D. Pa. 1996)).  The scope of what constitutes interference is described in the applicable regulations as follows: "Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b).

To state a claim for interference under the FMLA, a plaintiff must show that: (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA.  Lombardo v. Air Products and Chemicals, Inc., No. 06-1120, 2006 U.S. Dist. LEXIS 46077 at *11 (E.D. Pa. July 7, 2006)(citing Weisman v. Buckingham Twp., No. 04-4719, 2005 U.S. Dist. LEXIS 11696 at *11 (E.D. Pa. June 14, 2005)).

16

Pursuant to FMLA regulations, an employee must give an employer notice that he or she needs to take FMLA leave.  29 C.F.R. § 825.302; Wilson v. Lemington Home for the Aged, 159 F.Supp.2d 186, 191 (W.D. Pa. 2001)(Ambrose, J.).  If the leave is foreseeable, the employee must provide thirty days' notice.  Id.  If thirty days' notice is not possible, then notice must be given "as soon as practicable."  Id.  An employee need not specifically mention the FMLA or assert rights under it to satisfy the notice requirement.  29 C.F.R. § 825.302(c); Wilson, 159 F.Supp.2d at 192.  The employee need only state that leave is needed.  Id.

In Sommer v. The Vanguard Group, 461 F.3d 397 (3d Cir. 2006), the court of appeals noted:

> [T]he FMLA declares it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" in the FMLA.  § 2615(a)(1).  Such a claim is typically referred to as an "interference" claim, and is acknowledged to "set floors for employer conduct."  Callison v. City of Philadelphia, 430 F.3d 117,119 (3d Cir. 2005).

Id. at 399.  "After an eligible employee returns from an FMLA leave, the employee is entitled to be reinstated to his or her former position, or an equivalent one."  Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 141 (3d Cir.2004)(citing 29 U.S.C. § 2614(a)(1)).  "If the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, the employee has no right to restoration to another position under the FMLA. . . ." 29 C.F.R. § 825.214(b).  In other words, the FMLA does not require "an employer to provide a reasonable accommodation to an employee to facilitate his return to the same or equivalent position at the conclusion of his medical leave."  Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 384 (3d Cir.2002).

17

Plaintiff has adduced prima facie evidence of elements one through four of an interference claim.  With respect to the first and second elements, there is no dispute that plaintiff was an eligible employee under the FMLA and that the defendant was an employer subject to the FMLA's requirements.  With respect to the third element, the record is clear that plaintiff was entitled to take FMLA leave. (Chapman Dep. at 73,76; Dembowski Dep. at 12.)

With respect to the fourth element, there exists a genuine issue of material fact.  Plaintiff submits that she gave notice of her intent to take FMLA leave when she contacted Dembowski on the morning of June 21, 2005.  Plaintiff claims that she advised Dembowski at 8:30 a.m. or 9:00 a.m. that she would be taking off the week due to illness.  Plaintiff informed Dembowski that she would be seeking medical treatment either in the hospital or with her doctor on the following Monday, June 27, 2005.  On the same day, at or around 5:00 p.m., plaintiff informed Thornton that she would be taking some time off work until plaintiff saw her physician.  Plaintiff informed Thornton that she had previously contacted HR to request intermittent family medical leave.  Two witnesses heard plaintiff tell Thornton that she was ill and would not return to work until after she saw her physician.  Although Dembowski, Kurzdorfer and Thornton, thus UPMC, vigorously deny the events as recalled by plaintiff, the court must view the facts in the light most favorable to plaintiff.  When viewing the facts in the light most favorable to plaintiff, there exists a genuine issue of material fact as to whether plaintiff notified UPMC that she intended to take FMLA leave.

The court also notes that the FMLA generally requires an employee to give notice thirty days before taking FMLA leave.  In this case, however, plaintiff was required to give notice of her need to take an FMLA leave as soon as practicable because, viewing the facts in the light

18

most favorable to plaintiff, her illness was not foreseeable thirty days beforehand. Plaintiff testified that when she went home from work on June 20, 2005, she became very ill. At 5:00 a.m. on the morning of June 21, 2005, plaintiff notified her colleagues that she would be unable to come to work as a result of illness. Hours later, plaintiff informed Dembowski that she was ill and intended to take her previously approved intermittent FMLA leave. Accordingly, if the jury credits plaintiff's testimony, plaintiff could establish that she gave notice as soon as practicable to UPMC regarding her intention to take FMLA leave.

The fifth element for a prima facie claim of interference under the FMLA requires plaintiff to show that she was denied a benefit to which she was entitled under the FMLA. Plaintiff's testimony shows that she was not denied a benefit under the FMLA because she was unable to perform the essential functions of her position at the end of a twelve-week period. As noted above, "[t]he FMLA does not require an employer to provide a reasonable accommodation to an employee to facilitate his return to the same or equivalent position at the conclusion of his medical leave." Rinehimer, 292 F.3d at 384 (citing 29 C.F.R. § 825.214(b)); Fogleman v. Greater Hazleton Health Alliance, 122 Fed.Appx. 581, 587 (3d Cir.2004)(citing Rinehimer); Deery v. Port Authority Transit Corp., No. 05-1353, 2006 WL 2470380, *4 (D.N.J. August 23, 2006)(citing Rinehimer); see Reynolds v. Phillips & Temro Indus., Inc., 195 F.3d 411 (8th Cir. 1999) (cited with approval in Rinehimer); Tardie v. Rehabilitation Hosp. of Rhode Island, 168 F.3d 538 (1st Cir.1999)(cited with approval in Rinehimer). It is well settled that under the FMLA an employee must be able to return to her original position without accommodation after her medical leave. See Rinehimer, 292 F3d. at 384; Lombardo v. Air Prods. and Chems. Inc., No. 05-1120, 2006 WL 1892677 (E.D. Pa. July 7, 2006) (citing Fogleman, 122 Fed.Appx. at 587)).

Defendant argues that plaintiff is judicially estopped from pursuing a FMLA claim because she previously filed an application for SSDI benefits asserting that she was "permanently disabled."  The court need not reach that argument here because it is undisputed that plaintiff was unable to return to her position without an accommodation.  Plaintiff's position with UPMC  was a full-time position.  In her deposition, plaintiff testified that she cannot work full-time.  In order for plaintiff to return to UPMC at the end of her twelve-week leave, she would have been required to show that she was able to return to her previous or an equivalent full-time position.  Plaintiff was unable to do so as evidenced in her deposition taken on May 8, 2006, almost one year later.  Chapman Dep. at 40, 108.  There is no question that plaintiff could not have performed the essential functions of her job at the end of twelve weeks of FMLA leave.  Accordingly, plaintiff cannot establish a prima facie case of interference and summary judgment must be granted in favor of UPMC with respect to plaintiff's interference claim under the FMLA.

## C.  Retaliation Claim

Plaintiff asserts a claim of retaliation under the FMLA.  Plaintiff argues that she did not resign, but instead was terminated at the result of retaliation by defendant relating to the exercise of her FMLA rights.  Defendant argues that plaintiff is unable to maintain a claim for retaliation because she cannot raise a genuine issue of material fact that plaintiff's discharge was pretextual.  Defendant argues that plaintiff resigned from her employment with UPMC and there was no retaliation.

The Supreme Court recognized that it is often difficult for a plaintiff to prove that an employer acted with "conscious intent to discriminate."  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  The Supreme Court's McDonnell Douglas burden-shifting framework for Title

VII retaliation claims is applicable to FMLA retaliation claims.  In Wilson v. Lemington Home for the Aged, 159 F.Supp.2d 186, 194-95 (W.D. P.A. 2001), the court found that "in analyzing claims for retaliation under the FMLA, the court should look to the legal framework established in Title VII claims."

The familiar McDonnell Douglas framework requires a plaintiff alleging retaliation claims under the FMLA to first establish a prima facie case of retaliation.  The prima facie case, the elements of which depend upon the type of claim the plaintiff is alleging, "eliminates the most common nondiscriminatory reasons for the plaintiff's rejection."  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 & n.6 (1981).  In so doing, the prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors."  Id. at 254.

If the plaintiff successfully demonstrates a prima facie case of discrimination, the burden of production (but not the burden of persuasion) shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment decision.  Simpson v. Kay Jewelers, 142 F.3d 639, 644 n.5 (3d Cir. 1998).  The burden on the defendant at this junction is "relatively light," and the defendant can satisfy this burden "by introducing evidence which, *taken as true*, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision."  Fuentes v. Perskie, 32 F.2d 759, 763 (3d Cir. 1994) (emphasis added).

Once the defendant offers a legitimate nondiscriminatory reason for the challenged conduct at issue, "'the McDonnell Douglas framework – with its presumptions and burdens' – disappear[s], . . . and the sole remaining issue [i]s 'discrimination *vel non.'"  Reeves v.

21

Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000)(citations omitted).  The plaintiff, thus,

has the ultimate burden of proving by a preponderance of the evidence that the legitimate reasons

offered by the defendant were not its true reasons, but were a pretext for discrimination.  Jones v.

School Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999).

### 1.  Prima Facie Case for Retaliation

An FMLA retaliation claim is contemplated by section 815.220(c) of the regulations

implementing 29 U.S.C. § 2615(a).  29 C.F.R. § 825.220(c)[3]; see Conoshenti v. Public Service

Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004) (cited 29 C.F.R. § 825.220(c) and noted

FMLA retaliation claims arise under 29 U.S.C. § 2615(a), the interference provision of the

FMLA).  To establish a prima facie case for retaliation under the FMLA, a plaintiff must show

that (1) she took an FMLA leave, (2) she suffered an adverse employment decision, and (3) the

adverse decision was causally related to her leave.  Conoshenti, 364 F.3d at 146.

There is a genuine issue of material fact with respect to whether plaintiff meets the first

requirement.  Plaintiff alleges that she took FMLA leave on June 20, 2005 when, as discussed

previously, she notified Dembowski that she needed to take her previously approved intermittent

FMLA leave.  Viewing the evidence of record in the light most favorable to the nonmoving

---

[3]29 C.F.R. §825.220(c) provides:
> (c) An employer is prohibited from discriminating against employees or
> prospective employees who have used FMLA leave. For example, if an
> employee on leave without pay would otherwise be entitled to full benefits
> (other than health benefits), the same benefits would be required to be
> provided to an employee on unpaid FMLA leave. By the same token,
> employers cannot use the taking of FMLA leave as a negative factor in
> employment actions, such as hiring, promotions or disciplinary actions;
> nor can FMLA leave be counted under "no fault" attendance policies.

party, this court finds that plaintiff has adduced sufficient evidence to met the first requirement of her retaliation claim.

The second requirement is that plaintiff must have suffered an adverse employment action.  See Baltuskonis v. US Airways, Inc., 60 F. Supp.2d 445, 448 (E.D. Pa. 1999).  Plaintiff alleges that her employment with UPMC was terminated as a result of her request for FMLA leave.  Termination from employment qualifies as an "adverse employment action." Id.; see Metzler v. Federal Home Loan Bank of Topeka, 464 F.3d 1164, 1171 n.2 (10th Cir. 2006)(applied Title VII standard for adverse employment action "[b]ecause 'the FMLA's [retaliation] clause' is derived from Title VII and is [thus] intended to be construed in the same manner'")(quoting Duckworth v. Pratt Whitney, Inc., 152 F.3d 1, 9 n.8 (1st Cir. 1998) (certain brackets in original); see also Constant v. Mellon Financial Corp., No. 06-3439, 2007 WL 2570810 (3d Cir. Sept. 7, 2007) ("An employer that terminates an employee in retaliation for having taken FMLA leave violates the FMLA itself and its implementing regulations."); Hicks v. The Tech Indus., No. 05-1740, 2007 U.S. Dist. LEXIS 32733, *50-51 (W.D. Pa. May 3, 2007) ("In analyzing retaliation claims under the FMLA, courts look to the legal framework established for Title VII claims.").

In Grosso v. Federal Express Corp., 467 F.Supp.2d 449 (E.D. Pa. 2006), the district court recognized that the United States Court of Appeals for the Third Circuit

> has not yet had an opportunity to determine whether the standard enunciated in Burlington Northern applies to FMLA retaliation claims. However, several courts that have reached this issue have applied Burlington Northern to claims of retaliation under the FMLA. See *Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 n. 2 (10th Cir.2006); *Foraker v. Apollo Group, Inc.*, 2006 WL 3390306, *2 (D.Ariz. Nov.22, 2006); *Campbell v. Washington County Public Library*, 2006 WL 2612985, *6 (S.D.Ohio Sept.8, 2006).  Moreover, courts in this Circuit have previously concluded that Title VII jurisprudence "provides helpful

> guidance" in FMLA retaliation cases. See, e.g., *Collier v. Target Stores Corp.*, 2005 WL 850855, *5-6 (D.Del. Apr.13, 2005). Thus, this Court concludes that *Burlington Northern* provides guidance in determining whether plaintiff was subject to an "adverse employment action."

Id. at 459.  Termination has been recognized as an adverse employment action in Title VII cases and this court concludes a termination would suffice for an adverse employment action in an FMLA case.  See Id. at 459 n.8 (citing Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300-01 (3d Cir 1997)).  In Lipscomb v. Electronic Data Systems Corp., 462 F.Supp. 2d 581 (D. Del. 2006), the court noted:

> In order for retaliatory conduct to rise to the level of an adverse employment action under Title VII, it "must be serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment . . . ." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300-01 (3d Cir.1997). "An adverse employment action necessarily encompasses all tangible employment actions such as 'hiring, firing, failing to promote, reassignment or a decision causing a significant change in benefits.'" *Sherrod v. Phila., Gas Works*, 57 Fed.Appx. 68, 74-74, 2003 WL 230709, *4 (3d Cir.2003) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)); *see also Abramson v. William Paterson Coll.*, 260 F.3d 265, 288 (3d Cir.2001) (finding termination of employment is clearly an adverse employment action).

Id. at 588 (emphasis added).  The court finds that because plaintiff was terminated, she met the second requirement of her retaliation claim.[4]

---

[4]Defendant, citing Dogmanits v. Capitol Blue Cross, 413 F.Supp.2d 452 (E.D. Pa. 2005), would have this court read into the elements of a retaliation claim the requirement that a plaintiff must also show she was denied a benefit under the FMLA – one of the requirements of an interference claim discussed above.  The court of appeals, however, has not recognized that element for a retaliation claim and this court must therefore decline to do.  See Conoshenti, 364 F.3d at 146 (setting forth the three elements of an FMLA retaliation claim).  As discussed previously in determining whether an adverse employment action exists for purposes of an FMLA retaliation claim, the court is guided by the analysis applicable to a Title VII claim. See Lipscomb, 462 F.Supp.2d at 588.  To require that the interference claim element relating to denial of benefits be established in a retaliation claim would effectively conflate the two claims.

The third and last requirement for a prima facie case for retaliation is that a casual

connection must exist between the adverse decision and plaintiff's exercise of her FMLA rights.

Id.  The United States Court of Appeals for the Third Circuit articulated two main factors that are

relevant with respect to establishing a causal link to satisfy a prima facie case of retaliation: (1)

timing or (2) evidence of ongoing antagonism.  Abramson v. Wm. Patterson College of N.J., 260

F.3d 265, 288 (3d Cir. 2001) ("Temporal proximity . . . is sufficient to establish the causal link.

[A] plaintiff can [also] establish a link between his or her protected behavior and subsequent

discharge if the employer engaged in a pattern of antagonism in the intervening period.").  As

this court stated in Sabbrese v. Lowe's Home Centers, Inc., 320 F.Supp.2d 311 (W.D. Pa. 2004):

> The United States Court of Appeals for the Third Circuit is somewhat
> ambivalent with respect to whether timing alone is sufficient to satisfy
> the causation prong of the prima facie case.  See Woodson v. Scott Paper Co.,
> 109 F.3d 913, 920-921 (3d Cir. 1997) ("Temporal proximity is sufficient
> to establish the causal link."); Jalil v. Avdel Corp., 873 F.2d 701 (3d Cir.
> 1989) (causal link established where plaintiff discharged two days
> following employer's receipt of the plaintiff's EEOC claim); but c.f.
> Quiroga v. Hasbro, Inc., 934 F.3d 497 (3d Cir. 1991) (following bench
> trial, court determined "as a matter of fact" the timing of the plaintiff's
> discharge alone did not raise an inference of retaliation); Krouse v.
> American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) (causation
> prong not established on timing alone where 19 months passed following
> protected activity and adverse employment action: "Even if timing alone
> could ever be sufficient to establish a causal link, we believe that the
> timing of the alleged retaliatory action must be 'unusually suggestive' of
> retaliatory motive before a causal link will be inferred.").  Timing,
> however, in conjunction with other types of suggestive evidence, is clearly
> sufficient to demonstrate the causal link.  Farrell v. Planters Lifesavers
> Co., 206 F.3d 271, 280-81 (3d Cir. 2000).  For example, timing combined
> with evidence of inconsistent reasons given by an employer for an
> employee's termination was held to satisfy the causation prong of the
> prima facie case.  Waddell v. Small Tube Products, Inc., 799 F.2d 69, 73
> (3d Cir. 1986).  See also Abramson, 260 F.3d at 289 ("Here, as we found
> in our discussion of the discrimination claim, [plaintiff] has succeeded in
> both casting doubt on the reasons [her employer] proffered for her

termination, and in demonstrating that those reasons were vague and inconsistent."); see also EEOC v. L.B. Foster Co., 123 F.3d 746, 753-54 (3d Cir.1997), cert. denied, 522 U.S. 1147 (1998).

Id. at 323.

It is undisputed that plaintiff first requested FMLA leave on April 4, 2005 and that UPMC subsequently approved plaintiff's intermittent FMLA leave. If a jury were to credit plaintiff's testimony, the jury could conclude that on June 20, 2005, at approximately 8:30 a.m. or 9:00 a.m., plaintiff sought to use her FMLA leave by communicating her request to Dembowski. Nine hours later, at approximately 5:30 p.m., Thornton contacted plaintiff and demanded plaintiff's resignation.[5] This nine-hour period of time is so short that it is "unusually suggestive" that plaintiff was terminated as a result of her request to utilize her FMLA leave. This court finds, therefore, that plaintiff adduced sufficient evidence with respect to whether a causal connection exists between plaintiff's request to utilize her FMLA leave and her termination from employment. Since plaintiff adduced sufficient evidence with respect to each element of a prima facie case for retaliation, the burden will shift to defendant to articulate a legitimate nondiscriminatory reason for her termination.

**2. Burden-Shifting**

Under step two of the McDonnell Douglas framework, where the plaintiff establishes a prima facie case of discrimination, a presumption arises that the employer unlawfully discriminated against the employee, shifting the burden of production to the defendant to "articulate some legitimate nondiscriminatory reason for the employee's rejection." McDonnell

---

[5]Thornton advised other HR personnel that plaintiff had resigned from employment at UPMC and UPMC treated plaintiff as having resigned.

26

Douglas, 411 U.S. at 802; see St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993). "[A]lthough

the McDonnell Douglas presumption shifts the burden of production to the defendant, '[t]he

ultimate burden of persuading the trier of fact that the defendant intentionally discriminated

against the plaintiff remains at all times with the plaintiff.'" St. Mary's Honor Ctr., 509 U.S. at

507 (citing McDonnell Douglas, 450 U.S. at 253).

A defendant is not required to meet this burden by a preponderance of the evidence, but

rather:

> the employee's prima facie case of discrimination will be rebutted if the
> employer articulates lawful reasons for the action; that is, to satisfy this
> intermediate burden, the employer need only produce admissible evidence
> which would allow the trier of fact rationally to conclude that the
> employment decision had not been motivated by discriminatory animus.

Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 257 (1981). If the burden of production

is met by the defendant, the ultimate burden of persuasion shifts back to the plaintiff to prove

"that the alleged reasons proffered by the defendant were pretextual and that the defendant

intentionally discriminated against the plaintiff." Jalil v. Avdel, 873 F.2d 701, 706 (3d Cir.

1989) (citing Burdine, 450 U.S. at 252-53).

At the summary judgment stage, the shifting burden requires the plaintiff to "point to

some evidence, direct or circumstantial, from which a fact-finder could reasonably either (1)

disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious

discriminatory reason was more than likely than not a motivating or determinative cause of the

employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (the "two-prong test").

To survive summary judgment, the plaintiff must submit evidence that allows the fact 2finder

"reasonably to infer that each of the employer's proffered non-discriminatory reasons was either

a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." Id. (citations omitted). The nonmoving plaintiff is required to "demonstrate such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder could rationally find them 'unworthy of credence' and hence infer that 'the employer did not act for [the asserted] non-discriminatory reasons.'" Id. (citations omitted). The necessary evidence may consist of the evidence submitted by the plaintiff in the prima facie case, as well as additional evidence rejecting the employer's legitimate nondiscriminatory reason as pretextual. Id. at 764.

In this case, defendant asserts that plaintiff was not terminated, but instead resigned from her employment. That assertion is supported by evidence in the record that satisfies defendant's burden of production under McDonnell Douglas. With respect to the final part of the test, "[o]nce the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, here plaintiff's resignation, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)." Fuentes, 32 F.3d at 763.

As noted, the United States Court of Appeals for the Third Circuit in Fuentes developed the two-prong test that is implicated when the employer articulates a legitimate, non-discriminatory reason for the plaintiff's termination. The two prongs of the Fuentes test are alternative tests. If one prong is satisfied then a plaintiff may survive summary judgment. Id. at 764. The two prongs are distinct and have been analyzed under different standards in subsequent court decisions. The first prong focuses on whether the plaintiff submitted evidence from which

28

a fact finder could reasonably disbelieve the employer's articulated legitimate reasons for the plaintiff's termination.  The second prong of the Fuentes framework requires the court to determine whether the plaintiff presented sufficient evidence of pretext; i.e, whether there is evidence of record, that "an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.  Fuentes, 32 F.2d at 764.  Here, only the first prong needs to be addressed because plaintiff adduced sufficient evidence to meet that prong.

Under the first prong, the plaintiff must point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder could rationally find them 'unworthy of credence' and hence infer that the proffered non-discriminatory reason 'did not actually motivate' the employer's action."  Simpson, 142 F.3d at 644.  The district court under this prong must focus on the legitimate, non-discriminatory reason offered by the employer.  Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 531(3d Cir. 1992) (stating that a plaintiff "does not establish pretext . . . by pointing to criticisms of members of the non-protected class, or commendation of the plaintiff, in categories the defendant says it did not rely upon. . . .").  The court is neither permitted to get involved in the subjective business decisions of the employer, nor set its own employment standards for the employer, unless there is evidence of discrimination.  Ezold, 983 F.2d at 527.

In the instant matter, defendant claims that plaintiff resigned from her position and was not terminated by defendant.  Viewing the evidence in the light most favorable to the nonmoving party, the court must conclude that  plaintiff adduced sufficient evidence that defendant's

29

assertion regarding her resignation from her employment was unworthy of credence.  On the date

of her illness, plaintiff contacted the night nurse on her floor to let her colleagues know that she

was ill and would be unable to come into work.  Plaintiff contacted Dembowski a few hours

later, during regular business hours, to indicate that she needed to take her previously approved

FMLA leave.  At approximately 5:30 p.m. the same day, plaintiff advised Thornton that she was

ill and had previously notified HR that she needed to take FMLA leave.  Plaintiff testified that

Thornton demanded plaintiff's resignation in response.  Thereafter, plaintiff abruptly ended the

conversation.  On June 24, 2005, plaintiff contacted Kurzdorfer to inquire about the status of her

FMLA leave as it related to her paycheck.  Plaintiff's actions were consistent with an individual

who had requested FMLA leave and not at all consistent with the actions of an employee who

resigned from their employment.  Based upon the record before the court and drawing all

reasonable inferences in plaintiff's favor, the court concludes that a reasonable jury could find

defendant's assertion that plaintiff resigned from her employment "unworthy of credence."

After reviewing the undisputed material facts of record, viewing all disputed facts in the

light most favorable to plaintiff and drawing all reasonable inferences in favor of plaintiff, the

court concludes that plaintiff adduced sufficient evidence for a reasonable fact finder to render a

verdict in favor of plaintiff on her retaliation claim under the FMLA.  Summary judgment,

therefore, will be denied with respect to plaintiff's retaliation claim under the FMLA..

## II.  Rehab Act

### A.  Failure to Accommodate

The Rehab Act forbids discrimination against qualified individuals with a disability in

matters of hiring, placement, or advancement.  Shiring v. Runyon, 90 F.3d 827, 830-31 (3d Cir.

1996).  In order to establish a prima facie case of discrimination under the Rehab Act, the employee must demonstrate: "(1) that he or she has a disability; (2) that he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that he or she was nonetheless terminated or otherwise prevented from performing the job." Id. at 83.  In this case, defendant argues that it did not have notice of plaintiff's alleged disability and that she did not request a reasonable accommodation as a matter of law.

### 1. Disability

The Rehab Act is interpreted in conjunction with the  the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq*. ("ADA"), with respect to various sections of the ADA, including those defining "disability."   See 29 U.S.C. §§ 791(g), 794(d).  To raise a cognizable claim for discrimination under the Rehab Act a plaintiff must establish, as part of her prima facie case, that she is disabled within the meaning of the Rehab Act.  See 29 U.S.C. §§ 705(20), 794; see also 42 U.S.C. § 12112(a); Cleveland v. Policy Management Sys. Corp., 526 U.S. 795, 806 (1999) (quoting 42 U.S.C. § 12111(8)); Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000).  The Rehab Act and the ADA define a "disability" as either: (1) "a physical or mental impairment that substantially limits one or more of the major life activities of such [an] individual"; (2) "a record of such impairment"; or (3) "being regarded as having such an impairment."  29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102(2)(A)-(C).

Here, plaintiff alleges that she is a disabled person under the Rehab Act because she is currently recovering from throat cancer, has a weakened immune system, chronic obstructive pulmonary disease, asthma, chronic back pain, bulging discs, hypothyroid, hepatitis C, cirrhosis

31

of the liver, arthritis, depression and bipolar disorder.  Plaintiff asserts that these conditions, or a combination of the conditions substantially limit her in performing one or more of her major life activities.  Plaintiff asserts that she cannot lift more than 15-20 pounds, has difficulty bending and cannot stoop.  Plaintiff alleges that as a result her ability to walk both long and short distances, sleep, recreate, work, stand, sit, cook and do laundry are impaired.  Under those circumstances there is no dispute plaintiff adduced sufficient evidence that plaintiff would be disabled within the meaning of the Rehab Act.

### 2.  Qualified Individual

Having concluded that plaintiff adduced sufficient evidence of her disability, the court must consider whether she is a "qualified individual."  The Rehab Act is interpreted in conjunction with the ADA's definition of "qualified individual with a disability." 29 U.S.C. § 794(d).  The ADA defines a "qualified individual with a disability" as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  There is a two-part test utilized to determine whether an employee is a "qualified individual with a disability." Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 580 (3d Cir. 1998).  The first part of the test requires the court to consider whether "the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." Id. (citing 29 C.F.R. pt. 1630, App. at 353-54).  Second, the court must determine "whether or not the individual can perform the essential functions of the position held or desired with or without reasonable accommodation." Id.  In this case, defendant does not challenge plaintiff's educational background, experience or skills to perform the position.

Furthermore, the undisputed record reveals that plaintiff would not be able to return to work without a reasonable accommodation.

### 3. Reasonable Accommodation

The court must next "consider whether plaintiff has demonstrated a genuine issue of material fact regarding [her] ability to perform the essential functions with reasonable accommodations." Id. With respect to granting a "reasonable accommodation" under the Rehab Act, "[a]n employer is not required to create a job for a disabled employee;" however, an "employer has a duty to reassign non-probationary employees if they become unable to perform the essential functions of their jobs, unless the reassignment would cause the employer undue burden." Mengine v. Runyon, 114 F.3d 415, 420 (3d Cir. 1997). A plaintiff must adduce evidence that there is a vacant, funded position she is capable of performing. Shiring v. Runyon, 90 F.3d 827, 832 (3d Cir. 1996).

Defendant would be liable under the Rehab Act if it failed to provide plaintiff – when she was a qualified individual – with a reasonable accommodation to her known impairments unless it can demonstrate that the accommodation would impose an undue hardship on the operation of its business. See 29 U.S.C. § 794(d); 42 U.S.C. § 12112(b)(5)(A); Shapiro v. Township of Lakewood, 292 F.3d 356, 359 (3d Cir. 2002); Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 579 (3d Cir. 1998). The evidence adduced by plaintiff is that she needed a part-time position. Under the Rehab Act and the ADA, while part-time work may be considered a reasonable accommodation, 42 U.S.C. § 12111(9)(B),  "[t]he ADA [and hence the Rehab Act] does not require an employer to create a new position to accommodate an employee with a disability." Buskirk v. Apollo Metals, 307 F.3d 160, 169 (3d Cir.2002)(citing Shiring, 90 F.3d at 831, which

interpreted an analogous provision of the Rehab Act).  Moreover, an employer is not required to

create a part-time position in order to facilitate an employee's need for part-time work.  See

Treanor v. MCI Telecommunications Corp., 200 F.3d 570 (8th Cir.2000); Terrell v. USAir, 132

F.3d 621, 625 (11th Cir.1998).  In this case, plaintiff did not adduce any evidence that there was a

part-time position available whose essential functions she could perform.  Under these

circumstances, summary judgment must be granted in favor of defendant on plaintiff's failure to

accommodate claim.

### B.  Failure to Engage in Good Faith in the Interactive Process

While the employee has the burden to make a facial showing that an accommodation is

possible by demonstrating that there is a vacant, funded position whose essential functions she is

capable of performing, Shiring, 90 F.3d at 832, it is often difficult for employees to identify a

suitable open position.  For that reason, employers are required under the Rehab Act to engage in

an "interactive process" with affected employees in an attempt to identify a reasonable

accommodation.  Mengine v. Runyon, 114 F.3d at 420.[6]  An employee "triggers" the employer's

---

[6]The court of appeals noted that the duty to engage in the interactive process is envisioned
in the federal regulations implementing the ADA, which provide, in pertinent part:

> To determine the appropriate reasonable accommodation it may be necessary for
> the [employer] to initiate an informal, interactive process with the qualified
> individual with a disability in need of the accommodation.  This process should
> identify the precise limitations resulting from the disability and potential
> reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3).

> [T]he employer must make a reasonable effort to determine the appropriate
> accommodation.  The appropriate reasonable accommodation is best determined
> through a flexible, interactive process that involves both the employer and the
> [employee] with a disability.

duty to engage in the interactive process when the employee presents information to her employer that she might have a disability.  Taylor v. Phoenexville School Dist., 184 F.3d 296, 314 (3d Cir. 1999).  Once the employer has been informed of the disability and the employee's desire for accommodations, the burden falls on the employer "to request additional information that the employer believes it needs."  Id.  Both parties must act in good faith throughout this process: the employee must inform the employer about the type of work the employee can perform, and the employer must inform the employee about available employment opportunities. Id.  In order to demonstrate that an employer violated its duty to engage in the interactive process, the employee must show the following four factors: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.  Conneen v. MBNA America Bank, N.A., 334 F.3d 318, 330 (3d Cir. 2003); Taylor, 184 F.3d at 319-20.

Defendant essentially argues that if plaintiff does not adduce evidence of any job which the employee could have performed, with or without a reasonable accommodation, the employer cannot be held liable for violating the Rehab Act.  In Mengine v. Bunyon, the United States Court of Appeals for the Third Circuit indicated in *dicta* that "where a plaintiff cannot demonstrate 'reasonable accommodation,' the employer's lack of investigation into reasonable accommodation is unimportant." 114 F.3d at 420. (citing Willis v. Conopco, Inc., 108 F.3d 282, 285 (11th Cir. 1997)).  That language, however, was not essential to the court's holding, which

---

29 C.F.R. pt. 1630, App. at 351.

was that the evidence of record demonstrated the employer engaged in the interactive process in good faith.  Any indication that this broad *dicta* applies to give employers a free pass from engaging in the interactive process was refuted by the court of appeals in their subsequent decision in Taylor v. Phoenixville School District, 184 F.3d 296 (3d Cir. 1999).

In Taylor, the plaintiff, who had worked for the defendant school district for twenty years, became psychotic at work and was diagnosed with bipolar disorder.  Taylor was then institutionalized for approximately two months.  During that time period, Taylor's son and her doctors were in contact with the defendant.  Taylor subsequently returned to work, with some restrictions; however, she began making numerous errors, which her supervisor documented and compiled into a bullet-format list.  As Taylor's disciplinary notices piled up, Taylor had several disciplinary meetings with school district officials and her union president.  Taylor's son submitted an affidavit stating that he provided the school district with diagnostic and treatment information and that he also asked for "accommodations" for Taylor.  Despite this fact, the school district did not make any accommodations for Taylor, and Taylor was ultimately terminated.  Following Taylor's termination and during the discovery phase of the litigation, school district officials stated that they did not become aware of the severity of Taylor's condition until after the lawsuit was filed.  Id. at 314.

Prior to her termination, Taylor specifically requested an accommodation to be transferred to another position; however, Taylor later conceded that such an accommodation was not feasible.  The court of appeals determined that even though Taylor realized during litigation that a requested accommodation was not possible, this fact was not fatal to her claim that the

36

school district failed to engage in the interactive process.  Id. at 315.  According to the court of

appeals:

> We do not think that it is fatal to Taylor's claim that her son did not request a
> specific accommodation or that Taylor's request in March of 1994 was for an
> accommodation *that she admitted was not possible.*  The interactive process, as its
> name implies, requires the employer to take some initiative. . . . *The interactive*
> *process would have little meaning if it was interpreted to allow employers, in the*
> *face of a request for accommodation, simply to sit back passively, offer nothing,*
> *and then, in post-termination litigation, try to knock down every specific*
> *accommodation as too burdensome.*  That's not the proactive process intended: it
> does not help avoid litigation by bringing the parties to a negotiated settlement,
> and it unfairly exploits the employee's comparative lack of information about what
> accommodations the employer might allow.  In addition, in some cases courts may
> be better positioned to judge whether the employer met with the employee in good
> faith than to judge how burdensome a particular accommodation really is.

Id. (emphasis added).  The purpose of the interactive process, then, is for both the employer and

the employee to sit down and discuss, in good faith, the prospects of a reasonable

accommodation for the employee.  As the court of appeals further stated, "an employer who has

received proper notice cannot escape its duty to engage in the interactive process simply because

the employee did not come forward with a reasonable accommodation that would prevail in

litigation."  Id. at 317.

In Taylor, the court of appeals determined that "the school district had more than enough

information to put it on notice that Taylor might have a disability, and therefore, in order to

trigger the school district's obligation to participate in the interactive process, Taylor or her

representative only needed to request accommodation."  Id. at 314.  The court of appeals noted

that the employer does not have to be aware of the specific nature of the employee's condition in

order for the specific duty to participate in the interactive process to attach.  Id.  The court of

appeals concluded that there was a genuine issue of material fact as to whether the school district

engaged in the interactive process in good faith, even in the face of Taylor's subsequent concession that there was no possible accommodation.[7]

Here, there is no evidence that part-time work was available.  The inquiry, however, does not end with that conclusion because in a failure to engage in the interactive process claim, a plaintiff does not need to introduce evidence that a job fitting her accommodation was available. Taylor, 184 F.3d. at 315.  The key issue here is whether plaintiff adduced sufficient evidence of the requisite factors to establish a violation of the duty to engage in the interactive process. The first factor in a failure to engage in the interactive process claim requires plaintiff to adduce sufficient evidence that defendant knew or might have known that plaintiff was disabled.

It is undisputed that plaintiff's supervisor, Thornton, who is alleged to have demanded plaintiff's resignation, did not know about plaintiff's medical conditions –  let alone that plaintiff was disabled.  Indeed, plaintiff testified that there was no way that Thornton would have known

---

[7]     With respect to the defendant's motion for summary judgment on the plaintiff's failure to engage in the interactive process claim, the court of appeals noted:

> When an employee has evidence that the employer did not act in good faith in the interactive process, however, we will not readily decide on summary judgment that accommodation was not possible and the employer's bad faith could have no effect.  *To assume that accommodation would fail regardless of the employer's bad faith would effectively eliminate the requirement that employers must participate in the interactive process.*  An employer who acted in bad faith would be in essentially the same, if not better, position than one who participated; that is, both employers would be arguing that the employee failed to find an accommodation making him or her able to perform the essential function of the job.  The less the employer participated, the easier this would become, and as a result, the requirement that employers participate in the interactive process would be toothless.  Thus, where there is a genuine dispute about whether the employer acted in good faith, summary judgment will typically be precluded.

Taylor, 184 F.3d at 318 (emphasis added).

about her medical conditions.  Similarly, plaintiff does not allege that her previous supervisors

knew that she was disabled.  While Coleman was aware that plaintiff previously had throat

cancer and was suffering from sore throats related to that condition years after the fact, there is

no evidence of record that Coleman knew or might have known that plaintiff's sore throats were

a disability within the meaning of the Rehab Act.  Plaintiff admits that, while employed at Living

Sober, she did not tell Coleman about her medical conditions and only expressed a general

dissatisfaction with her schedule.  Plaintiff indicated that she complained about her schedule four

or five times in 2004.  Specifically, in the summer of 2004, plaintiff told Bell that the scheduling

had a negative affect on her physically because of her physical ailments.  Plaintiff did not explain

or detail her physical ailments for Bell.  Plaintiff did not indicate that she could not work her

scheduled hours and, in fact, continued to work the hours until the summer of 2005 when she

requested a transfer. Additionally, there is no evidence of record that Bucci knew or might have

known that plaintiff had either a medical condition or a disability.

Plaintiff argues that UPMC knew about her disability because it had knowledge that she

needed intermittent FMLA leave.  This court is not persuaded by that argument.  The mere fact

that an employee, like plaintiff,  requires intermittent FMLA leave for a serious health condition[8]

does not mean that the employer is automatically on notice that the employee is "disabled" as

that term is defined under the ADA[9] and hence under the Rehab Act and that the employer needs

---

[8] Under the FMLA, a "serious health condition" is defined as "an illness, injury,
impairment, or physical or mental condition that involves-(A) impatient care in a hospital,
hospice, or residential medical care facility; or (B) continuing treatment by a health care
provider." 29 U.S.C. § 2611(11).

[9] The ADA defines a  "disability" as either: (1) "a physical or mental impairment that
substantially limits one or more of the major life activities of such [an] individual"; (2) "a record

to engage in the interactive process.  If the court were to reach the conclusion sought by plaintiff,

virtually every request for FMLA leave for a serious health condition would trigger an

employer's duty to engage in the interactive process.  Indeed, plaintiff cited no caselaw or

statutory support for the suggestion that when an employee qualifies for intermittent FMLA

leave, the employee automatically puts the employer on notice that the employee is disabled for

the purposes of the Rehab Act or the ADA.  Failure to find any support for this argument is not

surprising because the standards for determining whether a serious health condition exists for

purposes of the FMLA are not the same as determining whether a person is disabled for purposes

of the ADA or the Rehab Act.

> We have often stated "[d]isability is a term of art under the ADA." *Doyal*
> *v. Okla. Heart, Inc.*, 213 F.3d 492, 495 (10th Cir.2000); *Poindexter v.*
> *Atchison, Topeka & Santa Fe Rwy. Co.*, 168 F.3d 1228, 1230 (10th
> Cir.1999).  In contrast, the leave provisions of the FMLA are wholly
> distinct from the statutory definition of "disability" and an employer's
> reasonable accommodation obligations covered under the ADA.  As courts
> have recognized in various contexts, "there may be some parallels between
> the ADA and FMLA, but applicable regulations explicitly state that ADA's
> 'disability' and the FMLA's 'serious health condition' are different
> concepts, and must be analyzed separately." *Hurlbert v. St. Mary's Health*
> *Care Sys., Inc.*, 439 F.3d 1286, 1295 (11th Cir.2006) (quoting *Stekloff v.*
> *St. John's Mercy Health Sys.*, 218 F.3d 858, 861 (8th Cir.2000)); *see also*
> *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 249 (6th Cir.2004)
> ("Unlike the FMLA, the finding of a disability is the key 'that unlocks the
> storehouse of statutory protections' under the ADA."). Given the very
> different focus of the two statutory protections, [a] suggestion to apply for
> FMLA leave and [the employer's] approval of [the plaintiff's] application
> does not demonstrate an issue of fact as to whether [the plaintiff] was
> considered disabled under the ADA.

---

of such impairment"; or (3) "being regarded as having such an impairment."  42 U.S.C. §
§12102(2)(A)-(C).

Berry v. T-Mobile USA, Inc., 490 F.3d 1211, 1219-20 (10th Cir. 2007) (footnote omitted); see 29

C.F.R. § 825.702(b);Vincent v. Wells Fargo Guard Servs., Inc. of Fla., 3 F.Supp.2d 1405, 1420

(S.D. Fla. 1998) (cited with approval in Robinson v. Lockheed Martin Corp., 212 Fed. Appx.

121, 2007 U.S. App. LEXIS 331 (3d Cir. Jan. 8, 2007) (recognized ADA "disability" and FMLA

"serious health condition" are different concepts requiring separate analyses).

      Plaintiff did not request FMLA leave until April 4, 2005, two months after she was

hospitalized.  Plaintiff's application for FMLA leave did not raise an issue concerning a

disability.  Notably, in plaintiff's FMLA leave application, plaintiff's physician, Cichon,

indicated that plaintiff had a chronic condition.  While Cichon indicated that plaintiff needed to

work intermittently for one to two week intervals, he did not indicate that plaintiff was unable to

work.  In his assessment of whether plaintiff would be able to perform the essential functions of

her job, Cichon informed UPMC that plaintiff was able to perform all of the essential functions

of her job.  Further, plaintiff informed Dembowski that she would "go long periods [of time]

without being ill."  (Chapman Dep. Ex. D.)  Plaintiff informed Dembowski that she had been

admitted to the hospital in February 2005, but had not been in the hospital since 2002.  Plaintiff

also informed Dembowski that she had recently believed that her condition was worsening only

to improve three to four days later.  Based upon plaintiff's and plaintiff's physician's

representations about plaintiff's physical condition, a reasonable factfinder could not conclude

that UPMC knew or might have known that plaintiff had a "disability" as defined under the ADA

or the Rehab Act.

      The court must conclude, based upon the evidence of record, that plaintiff failed to

adduce sufficient evidence that UPMC knew or might have known that she had a disability and,

thus, plaintiff cannot meet the first element for this claim.  Under these circumstances, the court

need not address the other elements of the claim because UPMC's duty to engage in the

interactive process was not triggered.  Summary judgment must be granted in favor of UPMC on

this claim.

**C.  Judicial Estoppel**

In her amended complaint, plaintiff alleges that defendant discriminated against her by

failing to provide her with a reasonable accommodation as required by the Rehab Act.

Defendant argues that plaintiff made statements in support of her application for SSDI benefits

that estop her from now asserting that she is a qualified individual under the Rehab Act.  The

Rehab Act defines a qualified individual with reference to the ADA and, thus, decisions

concerning the ADA will be discussed here.  See Part II(A)(2) supra.

In Cleveland v. Policy Management Systems Corp., 526 U.S. 795 (1999), the United

States Supreme Court addressed whether an individual who sought SSDI benefits could later be

judicially estopped from claiming protected status under the ADA.  There, the plaintiff in her

SSDI application certified that she was "disabled" and "unable to work." Id.  In her ADA action,

however, the plaintiff claimed that she could "perform the essential functions" of a job with a

reasonable accommodation.  Id. at 798-99.  The defendants argued that the plaintiff was

judicially estopped from asserting her ADA claim because statements made in her application for

SSDI application were contrary to the position she was taking in her ADA claim.

The Court noted that when viewed in their respective contexts "these two seeming

divergent statutory contentions are often consistent with each other." Id. at 797.  The Court held

that "pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from

pursuing an ADA claim." Id.  This court need not resolve whether plaintiff should be judicially estopped here because, as discussed above, plaintiff has failed to adduce sufficient evidence to establish a prima facie case under the Rehab Act.

### *Conclusion*

After reviewing the undisputed material facts of record, reviewing all disputed facts in the light favorable to the nonmoving party, and drawing all reasonable inferences in favor of the nonmoving party, the motion for summary judgment filed by defendant UPMC Health System Doc. No. 18) will be **GRANTED IN PART** and **DENIED IN PART.**  The court concludes that plaintiff adduced sufficient evidence with respect to her claim for retaliation under the FMLA and therefore defendant's motion summary judgment with respect to that claim will be **DENIED**. Plaintiff, however did not adduce sufficient evidence for a reasonable fact finder to render a verdict in favor of plaintiff on her interference claim under the FMLA or on her claims under the Rehab Act and summary judgment will be **GRANTED** in favor of defendant on those claims.

By the court:

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: September 25, 2007

cc:     Counsel of record

43